TOCH et al. v. ZIBELL DAMP RESISTING PAINT CO.

(Circuit Court of Appeals, Second Circuit. May 9, 1916.)

No. 25.

1. PATENTS ⟨⟩37—ANTICIPATION—ACCIDENTAL PRIOR USE.

Patentable novelty is not negatived by a prior accidental production of the same thing, when the operator does not recognize the means by which the accidental result is accomplished, and no knowledge of them, or of the method of their employment, is derived from the prior use by any one.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 41–44; Dec. Dig. ⟨⟩37.]

2. PATENTS ⟨⟩52—ANTICIPATION—PRIOR USE.

To invalidate a patent by prior use, it is not necessary that the one who previously made use of the same process to accomplish the same result understood the scientific principle.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 70; Dec. Dig. ⟨⟩52.]

3. PATENTS ⟨⟩328—PRIOR PUBLIC USE.

The Toch patent, No. 813,841, for method of treating cement and cement construction, *held* void for anticipation, on evidence establishing beyond a reasonable doubt that the article made by defendant and alleged to infringe was publicly known and publicly used by defendant for the same purpose as at present more than two years before application for the patent.

Appeal from the District Court of the United States for the Southern District of New York.

On petition for rehearing. Denied.

For former opinion, see 231 Fed. 711, —— C. C. A. ——.

Kenyon & Kenyon, of New York City (Walter C. Noyes and William Houston Kenyon, both of New York City, of counsel), for appellants.

Merwin & Swenarton, of New York City (W. H. Swenarton, of New York City, of counsel), for appellee.

Before WARD and ROGERS, Circuit Judges, and MAYER, District Judge.

ROGERS, Circuit Judge. This court on February 21, 1916, filed an opinion in which it held that the plaintiffs were not entitled to recover from the defendant for an alleged infringement of letters patent No. 813,841 granted to them by the United States. The court reached its conclusion that the patent in suit was invalid because convinced of the public use of the thing alleged to infringe; such use having occurred more than two years prior to the application for the patent. The petition for the rehearing states that there is an important and well-established exception to the rule that a public use that occurred more than two years prior to application makes a patent void. That exception is that use without knowledge does not make a patent void. The counsel for the petitioners allege that, while the defense of prior use was sufficiently and properly pleaded, nevertheless on the original

argument of the case in this court they did not advert to this defense, but confined their attention to other defenses which the court below had based its decision upon, without reference to the particular defense upon which this court decided the case on the appeal. We granted, therefore, a rehearing, that the matter might be more fully presented in oral argument; but in doing so we do not wish to be understood as encouraging piecemeal prosecution of appeals, or that attorneys can ignore in argument a serious defense, and when they discover that the court has decided the case on a defense they saw fit to ignore upon the argument, expect the court will grant another hearing to correct their own mistaken judgment. In this case counsel for defendant in their original brief submitted to this court considered this defense of so much importance that upwards of 20 pages, in a brief of 87 pages were devoted to the prior public use. Moreover, counsel are mistaken in saying in the brief submitted upon the rehearing that they did not advert to this particular defense in their oral argument and so have been taken by surprise. A copy of the notes used by counsel in that oral argument and which counsel fully read and filed with the court at its close, reads as follows:

"That the patent is invalidated by certain alleged Zibell prior uses— but the evidence is inadequate and insufficient to the point of absurdity. The alleged prior use on the Blair squash court at Peapack, N. J., occurred after the Toch invention was made. Considered as a bar, because it occurred more than two years prior to the application, it fails: (1) Because there is no clear or sufficient evidence as to the nature or ingredients of the so-called 'Protectorine' and green paint that were then applied to the squash court walls; and (2) because it affirmatively appears that those walls had been previously so treated as to destroy the free lime therein, and so in any event the Toch operation could not possibly have proceeded or the Toch result have obtained."

We, however, concluded to grant a rehearing and to re-examine the testimony and the law relating to the prior public use and knowledge thereof. The reargument and the re-examination of the testimony and the law have not convinced the court that any error was committed in the conclusion originally reached.

The plaintiffs assert that their patent is infringed by the Protectorine which the defendant makes and sells. But the evidence satisfies us that Protectorine as now sold differs not at all from the article sold by defendant two years and more prior to the application for the patent in suit. And the law is so well settled that no reference to authorities is necessary for the proposition that that which infringes if later anticipates if earlier.

We are also satisfied that more than two years prior to the application for the patent in suit the defendant's mixtures were made public use of in the Blair squash court at Peapack, New Jersey. They were used on the Portland cement walls of that court.

[1] But counsel urge upon us that if such prior use occurred the conjunction of circumstances which brought about the embodying and realizing of the Toch process and product in the Zibell process and product was fortuitous, accidental, unintended, and not understood by anybody at the time. If that be true then the prior use is not such an anticipation as invalidates the Toch patent. For the doctrine is

well settled in the law of patents that novelty is not negatived by a prior accidental production of the same thing when the operator does not recognize the means by which the accidental result is accomplished, and no knowledge of them, or of the method of their employment, is derived from the prior use by any one. See Wickelman v. A. B. Dick Co., 88 Fed. 264, 31 C. C. A. 530 (1898), and the cases there cited.

However the evidence in this case satisfies us that the use of the Zibell product on the walls of the squash court is not to be regarded as in any sense accidental, or incidental, or unintentional within the meaning of Wickelman v. A. B. Dick Co., supra, or of such cases as Tilghman v. Proctor, 102 U. S. 707, 26 L. Ed. 279 (1880). Zibell made his product and sold it, and the public bought it and used it, to do the very things it was intended to do, and in doing it Toch says it infringes his composition.

The testimony shows that the walls of the squash court were constructed of heavy rubble masonry, faced with Dexter Portland cement concrete and Dexter Portland cement plaster; that the court was located below the general level of the cellar of Mr. Blair's country house, which was situated on the apex of the mountain at Peapack, N. J.; that various attempts had been made to paint these walls, and that all of them proved unsatisfactory, as it had been found impossible to make any of the paint which they could get hold of stick on the walls; that in the spring of 1903 the civil engineer in charge of all of Mr. Blair's construction work noticed in the Engineering News an advertisement of Zibell's product which in effect stated that the Zibell Damp Resisting Paint Company could furnish paints in various colors which would be guaranteed to resist dampness when applied to walls; that thereupon he obtained several gallons of a material known as Protectorine and applied the same to the wall with results which were entirely satisfactory, the original paint being still on the walls at the time of the trial of this case. After the completion of the work several cans were left unused. This testimony comes from a totally disinterested witness, who never talked with Zibell except over a telephone, and who had never met him. That the witness is trustworthy is shown by the fact that this use of Zibell's Protectorine was made in September, 1903, under the witness' direction, and that in 1915, when the testimony was given, he was still and had been continually in the employ of Mr. Blair, and had, under his supervision as superintendent of construction, expended on the Blair property over half a million dollars. The witness was asked:

"Was the material applied by the Zibell Damp Resisting Paint Company for treating this cement squash court apparently an unusual material and was it satisfactory for the purpose?"

This question was answered as follows:

"It was very unusual, and most satisfactory. By unusual, I mean that it accomplished certain work that ordinary paint could not. For instance, we had experimented on the squash court walls with a great many kinds of paint, ordinary and extraordinary and this paint was the first that we had obtained that would even stay. The walls, you must bear in mind, were subject to a great deal of dampness, and without knowing the chemical parts of

the Zibell paint I should imagine that there must have been some part that acted as an absorbent. This in itself would indicate a very different material from ordinary paint."

He was then asked:

"How did you happen to use Protectorine as the first coat?"

And he answered:

"Mr. Zibell recommended it after having been told the condition of the walls, and in fact I think that there were printed directions governing its application."

In view of this testimony it is quite impossible to maintain that the use of the Zibell Protectorine in 1903 was accidental, unintended, and not understood by anybody at the time.

The counsel for the plaintiff Toch seek to overcome the effect of this testimony by calling attention to the fact that before the Protectorine was applied to the walls of the squash court they had been previously painted. They would have us believe that the paint previously applied destroyed all the free lime in the surface of the walls, and so changed the condition of the walls that they were no longer Portland cement construction. The argument proves too much, for if it proves anything it is that Protectorine does not infringe the Toch invention, as it does not affect Portland cement construction until that construction has been changed by the application of some other product by changing its nature so as to destroy the free lime inherent therein. We are not, however, impressed by the testimony that the nature of the walls had been so changed by the previous paint which had been applied that their nature had been, as Portland Cement construction, destroyed. There is testimony in the record that a specimen of this wall was subjected to analysis by the defendant's expert, and that the specimen analyzed corresponded to an ideal Portland cement mixture, and that, where the alumina in an ideal Portland cement mixture ran 9.6 and the lime ran 62.2, the lime in the specimen ran 66.6 and the alumina 9.48. The testimony also showed that the specimen analyzed was not a portion distant from the surface, but the portion next to the surface, which would have been penetrated by the paint. The plaintiff's expert, on the other hand, made no analysis of cement taken from these walls. Moreover, the testimony of complainants' own witnesses shows that no substantial neutralization of the free lime could have occurred in the cement surface of the court. The complainants' expert testified that, if free lime had been eliminated from the surface temporarily by the oil, the fact that the walls were still wet and water was running through them would have resulted in more free lime percolating from the rear of the structure up to the surface. He also admitted that turpentine did not mix with water, but in fact repelled it. It is difficult, therefore, for us to see how the treatment given to the walls prior to the application of Zibell's Protectorine could have penetrated them at all. Prior to the application of the Protectorine to these walls the paints previously applied had been thoroughly scraped off, the walls then washed with turpentine, afterwards washed with washing soda and then washed again with water.

[2] In Andrews v. Cross (C. C.) 8 Fed. 269 (1881), Mr. Justice Blatchford, then Circuit Judge, said:

"It may be that the inventor did not know what the scientific principle was, or that, knowing it, he omitted, from accident or design, to set it forth. That does not vitiate the patent."

A long line of authorities shows that such is a well-established principle in the law. And if it is not necessary in order to sustain a patent that the inventor should understand the scientific principle which underlies his invention, it is also not necessary in order to invalidate the patent to show that one who made use of the same process to accomplish the same result prior to the patent understood the scientific principle. The Bell telephone transmits speech by transmitting it by means of electricity. But precisely how electricity operates under Bell's process, or what form it takes, neither Bell nor any one else knows. But that fact did not affect his right to obtain his patent. Telephone Cases, 126 U. S. 1, 8 Sup. Ct. 778, 31 L. Ed. 863 (1887). The scientific principle is no part of the process for which a patent is granted and does not need to be set forth. Emerson v. Nimocks, 99 Fed. 737, 40 C. C. A. 87 (1900); Eames v. Andrews, 122 U. S. 40, 7 Sup. Ct. 1073, 30 L. Ed. 1064 (1886).

Toch may understand better than Zibell the scientific principle involved in the process. He states in his specification:

"The acid filler above described reacts with the calcium compounds in the outer portion of the cement construction to form a hard resinate or other organic calcium salt, which serves as an efficient protective layer and which is reinforced by the second or exterior coating."

[3] And there is much in the brief submitted by his counsel on the chemical effect of the Toch mixture on a Portland cement construction. But chemical reactions as such are not patentable as a process and the references thereto do not aid us in the decision of the real question involved. That question is whether the Zibell Protectorine, which plaintiff says infringes his patent, was made and publicly used as now constructed more than two years prior to the application for the plaintiff's patent. If it was so used, and we are satisfied it was, then the remaining question is whether it was publicly known as well as used. And we think the proofs sufficiently show that it was so publicly known as well as used.

It may be that Zibell did not fully understand the scientific principle. But it is not necessary that either Zibell or the parties applying his Protectorine in 1903 should have known that an acid resin would react upon the free lime in the Portland cement and form calcium resinate. It is sufficient that it was known to Zibell what his Protectorine consisted of, and that the public knew of the result that would be accomplished by the application of the compound to Portland cement walls. We do not think it material that Zibell did not state in his advertisements or otherwise just what constituted the ingredients of his Protectorine, for it was open to any chemist to ascertain that for himself by making a chemical analysis.

It is clear to us that if Zibell, more than two years after the use of

it on the squash court, had applied for a patent on his Protectorine, claiming the process of applying the same material as previously used to a Portland cement wall, he could not have succeeded, or, if he did, could not have sustained the validity of his patent in the courts. We do not think that the fact that Zibell did not tell the public how to make Protectorine, as he would have had to do if he had applied for a patent, but kept its composition secret, precludes him now from defending a suit for the infringement of a patent, taken out subsequently for a like process accomplishing a like result.

In Walker on Patents, § 94, the law is stated as follows:

"To constitute public use, it is not necessary that more than one specimen of the thing invented should have been publicly used, nor that more than one person should have known of that use. Egbert v. Lippman, 104 U. S. 336, 26 L. Ed. 755 (1881). Nor is it necessary to public use that the article used could have been seen by the public eye if the ordinary use of such articles is veiled from view. Egbert v. Lippman, supra; International Tooth Crown Co. v. Gaylord, 140 U. S. 68, 11 Sup. Ct. 716, 35 L. Ed. 347 (1891); Walker on Patents, page 85."

We think the prior public use of Zibell's Protectorine thus shown to have been made cannot by any reasonable interpretation of the evidence be otherwise construed than as completely invalidating the patent in suit. The prior public use with knowledge is established beyond a reasonable doubt.

The prior decision of this court is correct, and is reaffirmed.

⟨⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes