L. E. WATERMAN CO. v. LOCKWOOD.

SAME v. LOCKWOOD et al.

(Circuit Court of Appeals, First Circuit. October 23, 1903.)

Nos. 446, 448.

1. PATENTS—INVENTION—FOUNTAIN PENS.
    The Waterman patent, No. 307,735, claims 1 and 2, for an ink duct for a fountain pen, consisting of a groove in a bar for conducting the ink from the reservoir to the point of the pen, are void for lack of patentable invention.

2. SAME.
    The Waterman patent, No. 293,545, for an ink duct for a fountain pen, the novel feature consisting of longitudinal fissures in the sides or walls of the groove for conducting the ink to the pen, held not infringed as to claims 1 and 2, and void for lack of patentable invention as to claim 3.

Appeals from the Circuit Court of the United States for the District of Massachusetts.

For opinions below, see 123 Fed. 300, 303.

Fred C. Hanford (Walter S. Logan, on the brief), for appellant.
Oliver R. Mitchell, for appellees.

Before COLT and PUTNAM, Circuit Judges, and BROWN, District Judge.

PUTNAM, Circuit Judge. These two appeals were argued together. In each case the patent expired after the bill was filed in the Circuit Court, so that, if the complainant prevailed, there could be, at the most, only an accounting. No. 446 arises on patent No. 307,735, dated on November 4, 1884, issued to Lewis E. Waterman on an application filed on June 28, 1883, and on patent No. 293,545, dated on February 12, 1884, issued to Mr. Waterman on an application filed on September 19, 1883. No. 448 is limited to patent No. 293,545. Patent No. 307,735 purports to be for new and useful improvements in fountain pens, and the claims in issue are 1 and 2, as follows:

"(1) An ink duct for a fountain pen, consisting of a groove in a bar on the side next the pen, extending throughout its entire length on the same plane, and communicating with the ink reservoir, for conducting the ink from the reservoir to the point of the pen.

"(2) An ink duct for a fountain pen, consisting of a groove in a bar extending throughout its entire length in the side which is to be next the pen and on the same plane, and communicating with the ink reservoir, and of gradually decreasing depth from the end which enters the reservoir to the end near the point of the pen."

The learned judge who heard the case in the Circuit Court says that claim 1 appears to be for nothing more than a groove or gutter for taking ink from the reservoir to the point of the pen, and that claim 2 is different from claim 1 only in the additional unpatentable element of gradually decreased depth. As to both claims the learned judge in the Circuit Court found no novelty. Using that expression to signify that neither claim contained patentable invention, we agree with him. The proposition is so plain that we need add nothing to this observation.

There are only three claims in patent No. 293,545, all of which are in issue, and which are as follows:

"(1) An ink duct for a fountain pen, consisting of a bar having a longitudinal groove formed in its surface and one or more longitudinal fissures in the side or sides of said groove, substantially as set forth.

"(2) In a fountain pen, the combination, substantially as hereinbefore set forth, of a barrel or ink reservoir, a tube connected therewith, an ink duct supported within said tube, and consisting of a bar having one or more longitudinal grooves formed in that portion of its surface which is in proximity to the pen, with one or more longitudinal fissures in the side or sides of said groove or grooves, and a pen secured between said tube and ink duct.

"(3) A fountain pen having an ink duct provided with one or more longitudinal fissures formed in its walls for facilitating the passage of the ink through said duct."

Claim 3 is only a restatement of the claims in patent No. 307,735, and is disposed of by our observations in regard to them. With

reference to the other claims there has been much discussion before us about capillary attraction. It appears from the record that the matter of capillary attraction has been in the minds of several persons engaged in the art of making fountain pens, both previously to Waterman and since. However, neither the record nor the propositions submitted to us by the parties develop anything with reference thereto on which we can rely. There is no proof of any scientific investigation of the operation of the various fountain pens in this respect, and no witnesses have been produced of the scientific training and education requisite to enable us to give value to their opinions. Moreover, capillary attraction appears only incidentally, and in such way that it cannot be said that the inventor relied thereon. The specification first speaks of "the downward flow of ink by gravity and through the action of capillary attraction in the act of writing." Capillary attraction is thus so coupled with gravity that it seems inconsequential, and suggests no definite conception. But, whatever may be said, it is overruled by what appears later in the specification, as follows:

"The narrow slits or fissures, ee, which are made in the groove, d, and which extend deeper into the feed-bar, C, than the bottom of the groove, d, serve to facilitate the downward flow of the ink which first follows these narrow channels, and thus the descending column of ink is kept on that side of the groove, the ascending column of air keeping on the other side of the groove."

Therefore it is plain that the present case cannot be said to involve any peculiarity arising in the direction of capillary attraction. The true theory of his pen, so far as appreciated by the patentee, can probably be said to be as follows: The fissures are so located, as shown by figure 2 attached to the specification, that they lie on the under side of the groove when the pen is being used. Consequently, we may well understand that the ink, while flowing to the pen, naturally follows the fissures, and leaves the groove open for the ascent of the air to the ink fountain. Of course, unless air is admitted to the ink fountain, the pressure of the atmosphere would keep the ink from descending. In other words, there is merely a simple arrangement to permit the access of sufficient air to the fountain to balance the pressure of the external air.

There are in the arts, and, indeed, in the common uses of life aside from the arts as technically understood, so many methods of conducting fluids and of balancing the external pressure of the atmospheric air, that there is left very little room for invention in reference thereto; so that any invention of this kind must be regarded as narrow, and limited to the details pointed out. Therefore these claims must have a strict construction, even if the common methods, to say nothing of the arts, left the patentee anything as to which he could claim invention. The learned judge who heard these cases in the Circuit Court found that no respondent infringed, because all the respondents used separable reeds instead of fissures. The respondents' methods of conducting fluids seem to have been known extensively for indefinite lengths of time. The only exception is the exhibit known as "A¹." The difficulty of the complainant's case

as to this, however, is that twice it admits that this exhibit is not "strictly within the terms of claims 1 and 2," although it is said that it is within claim 3. That claim, as we have already said, is void; and therefore it follows that the respondents could not have infringed any valid claim.

On the whole, we conclude that claims 1 and 2 of patent No. 307,-735, and claim 3 of patent No. 293,545, are void, and that claims 1 and 2 of the last-named patent were not infringed. Therefore the following judgments will be entered:

In No. 446—

The decree of the Circuit Court is affirmed, and the appellee recovers his costs of appeal.

In No. 448—

The decree of the Circuit Court is affirmed, and the appellees recover their costs of appeal.